1
2
3       **UNITED STATES DISTRICT COURT**
4       **NORTHERN DISTRICT OF CALIFORNIA**
5       **SAN JOSE DIVISION**
6

7  LEOPOLDO MANZO, JR.,                    Case No.  17-cv-01099-BLF
8                   Plaintiff,
                                           **ORDER GRANTING IN PART AND**
9          v.                              **DENYING IN PART MOTION FOR**
                                           **PARTIAL SUMMARY JUDGMENT**
10  COUNTY OF SANTA CLARA, et al.,
                                           [Re:  ECF 56]
11                  Defendants.
12

13         This case concerns the treatment Plaintiff Leopoldo Manzo, Jr. ("Mr. Manzo") received

14  while being held as a pretrial detainee in the Santa Clara County Main Jail for nearly two years.

15  Before the Court is the motion for partial summary judgment filed by Defendants Inocente

16  Carrasco, Jr., Arturo Romero, Adrian Romero, Dean Dowd, Theodore Shelton, and the County of

17  Santa Clara ("the County") (collectively "Defendants"). *See* Mot., ECF 56. Mr. Manzo opposes

18  summary judgment. *See* Opp'n, ECF 67. For the reasons elucidated below, the Court GRANTS in

19  part and DENIES in part Defendants' motion.

20

21  I.     **BACKGROUND**

22         Prior to his legal troubles in December 2014, Mr. Manzo had been injured by gunshots on

23  May 31, 2013. Opp'n 2; Ex. A, Manzo Dep. ("Defs.' Submission of Manzo Dep.") 38:10-12, ECF

24  58. He was hospitalized from May 31, 2013, until July 24, 2013. Defs.' Submission of Manzo

25  Dep. 38:10-18. Around the time of his discharge, a large ventral, or abdominal, hernia began to

26  develop at the site of the surgical incision on his torso, and Mr. Manzo presented with this hernia

27  when he was first examined by the medical staff at the Santa Clara County Main Jail ("Main Jail")

28  in December 2014. Compl. ¶ 19; Decl. of Alexander Chyorny ("Chyorny Decl.") ¶ 4, ECF 56-1.

1    When Mr. Manzo was released from the hospital in July 2013, he was still wheelchair-

2    bound, and by January 2014 he was walking with a cane. *Id.* 49:21-50:11. He was still healing

3    from his injuries at that point. *Id.* 50:22-51:5. Mr. Manzo recalled that a doctor has previously

4    made the determination that he is fully disabled from working. Ex. A, Manzo Dep. ("Pl.'s

5    Submission of Manzo Dep."), 33:5-17, ECF 67-2.

6        In December 2014, Mr. Manzo was having a mental health crisis, and he drove to the home

7    of Ruby Carrasco, whom he had dated between 2002 and 2004. Defs.' Submission of Manzo Dep.

8    38:22-39:13. Ms. Carrasco is also the sister of Defendant Carrasco. Opp'n 2. Mr. Manzo was

9    angry at her because he thought she had given him a disease, and he wanted to "address some

10   issues" "because our relationship had ended in bad terms." Defs.' Submission of Manzo Dep.

11   39:20-25.

12       On or about December 5, 2014, Mr. Manzo was arrested in Lathrop, California. Defs.'

13   Submission of Manzo Dep. 51:6-9. He was released on or about December 12, 2014, and his

14   mother picked him up and drove him to San Jose. *Id.* 51:13-19. The two were involved in an

15   altercation on the same day, and Mr. Manzo was arrested a few days after the incident, on

16   December 14, 2014. *Id.* 51:20-52:16; 53:1-3; Mot. 2. Mr. Manzo was booked into the Main Jail.

17   Mot. 2; Defs.' Submission of Manzo Dep. 54:10-12. Mr. Manzo was released on or about

18   December 17, 2014, and he was picked up by his mother once again. *Id.* 54:13-17. The two went

19   to the Valley Medical Center ("VMC") in Milpitas, California. *Id.* 54:18-19. Mr. Manzo was

20   rearrested at the VMC and re-booked into the Main Jail on December 18, 2014. *Id.* 54:20-22.; Ex.

21   B, Booking Sheets, ECF 58. Mr. Manzo was arrested on an outstanding warrant for assault with a

22   deadly weapon and stalking. *See* Booking Sheets.

23       Mr. Manzo remained in pretrial detention until November 14, 2016, when he pled no

24   contest to assault with a deadly weapon. Defs.' Submission of Manzo Dep. 36:2-23; Ex. C, Plea,

25   ECF 58; Mot. 2. He was sentenced to a strike-enhanced four years on December 16, 2016, and Mr.

26   Manzo was ordered released immediately since he had "half-time credit," which fulfilled his

27   sentence. Mot. 2; Ex. D., Judgment, ECF 58; Ex. PP., *People v. Manzo*, H044320 (Cal. Ct. App.

28   Aug. 31, 2017), ECF 62.

2

1   On December 17, 2014, while Mr. Manzo was incarcerated, Defendant Carrasco and Mr.

2   Manzo encountered each other for the first time. Ex. P, Domestic Violence Restraining Order 146,

3   ECF 60. They had never met previously. *Id.* Defendant Carrasco was working as a correctional

4   officer, and one of his responsibilities was transferring incarcerated persons from their cells to

5   their court hearings. *Id.* Upon seeing Defendant Carrasco's name badge, Mr. Manzo asked him if

6   he knew Ruby Carrasco, Mr. Manzo's ex-girlfriend. *Id.* Defendant Carrasco denied knowing her,

7   and he called his sister afterward and told her that Mr. Manzo did not seem "in his right mind" and

8   was "very irrate [sic] and aggressive" toward him. *Id.* Mr. Manzo told Defendant Carrasco that he

9   resembled Ruby Carrasco and also asked about their father, mother, and other sister. Domestic

10  Violence Restraining Order 140, 146. On December 18, 2014, Ruby Carrasco applied for a

11  domestic violence restraining order on behalf of herself and her father, sister, nephew, fiancé,

12  brother-in-law, and Defendant Carrasco. *See Id.* She wrote, "I am very terrified of Leopoldo

13  Manzo Jr. and fear for my families [sic] life, my 11 month old son and my partner's as well as my

14  brother. I know he is capable of harming me or my loved ones." *Id.* 146. The domestic violence

15  restraining order was granted as to all listed persons, including Defendant Carrasco, on January 9,

16  2015, and it expired on January 9, 2020. *Id.* 178, 182. However, the order specifically states that

17  "Restrained party [Mr. Manzo] is not in violation of the order, if restrained party has to be near

18  Inocente Carrasco, Jr. because he is in custody at Inocente's place of employment." *Id.* 179. Mr.

19  Manzo was present for the January 9, 2015 hearing on the domestic violence restraining order, but

20  Judge Christine Copeland stated on the record that Mr. Manzo "could not behave accordingly and

21  was ordered removed and has been removed." Ex. Q, Tr. of Domestic Violence Restraining Order

22  Hearing 14:9-10, ECF 61. Judge Copeland also observed that Mr. Manzo "appears to be quite

23  unstable, in an agitated state and has some impulse control issues, to say the least." *Id.* 14:1-3.

24      Mr. Manzo raises several complaints concerning his treatment at the Main Jail.

25  **A.  Alleged Excessive Force Incidents**

26      Mr. Manzo alleges he was a victim of excessive force at the hands of Defendants on two

27  dates.

28          **1.  March 2015**

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

On or about March 3, 2015,[1] after Mr. Manzo alleges that an unknown female officer prevented him from going to court, Defendant Adrian Romero handcuffed Mr. Manzo and placed him in a holding cell. Mot. 8; Ex. S, Dep. of Adrian Romero ("Adrian Romero Dep.") 23:4-12; 25:15-18, ECF 61. The parties do not agree on the circumstances leading to up to Defendant Adrian Romero's decision to handcuff Mr. Manzo and the appropriateness of the force.

After Mr. Manzo was placed in the holding cell, he alleges that Defendant Arturo Romero moved him to a different cell. Defs.' Submission of Manzo Dep. 89:5-12; 93:14-17; 94:12-16. Mr. Manzo alleges that, as Defendant Arturo Romero was inserting him into the second cell, he "shoved" him, and Mr. Manzo alleges, "I went flying into a door frame," and "almost fell." *Id.* 89:7-12. The parties dispute the level of force used. Mr. Manzo alleges his shoulder was bruised as a result of the incident. Compl. ¶ 87; Defs.' Submission of Manzo Dep. 97:13. Defendants point to the absence of a bruise in Mr. Manzo's medical records from appointments on March 5 and March 6. Ex. E, Medical Records 154-58, ECF 58.

### 2.   June 15, 2015

Mr. Manzo was scheduled to appear in Court on June 15, 2015, and his path crossed once again with Defendant Carrasco. The parties agree these events occurred on this date. Defs.' Submission of Manzo Dep. 126:17-18; Compl. ¶ 94. The parties agree that Defendant Carrasco ordered Mr. Manzo to step out of the holding cell, and they agree that Mr. Manzo did not comply. 127:2-8; Ex. X, Dep. of Inocente Carrasco ("Carrasco Dep.") 100:5-8, ECF 61. The parties do not agree on the events leading up to Defendant Carrasco ordering Mr. Manzo to step out of the holding cell. According to Defendant Carrasco, Mr. Manzo "was given two orders to exit the cell and in defiance responded, fuck you, I'm not leaving, I'm not exiting," and then Defendant Carrasco and another deputy "grabbed him and brought him out of the cell." Carrasco Dep. 102:1-17. Mr. Manzo disputes this response and further states that Defendant Carrasco and the other deputy were restraining him "had me up against the wall, tried to make me stand up on my toes,

---

[1] The date of this specific interaction is unclear. Defendants allege in their brief this occurred on March 3, 2015. Mot. 8. The complaint and Mr. Manzo's deposition state this incident occurred after March 3— "probably less than a week" after, according to the deposition. Defs.' Submission of Manzo Dep. 76:7-23; Compl. ¶¶ 84-88.

1    which I cannot do due to the fact of my nerve damage, what was going on. I was pleading to

2    Carrasco that I was disabled and he his response was, 'Shut up. You walk fine.'" Defs.'

3    Submission of Manzo Dep. 127:10-15. Defendant Carrasco does not recall what Mr. Manzo said

4    while up against the wall. Carrasco Dep. 107:20-24.

5         Both parties agree that deputies that are not parties to this case escorted Mr. Manzo back

6    upstairs to his housing unit with Defendant Carrasco following, but no longer touching, Mr.

7    Manzo. Defs.' Submission of Manzo Dep. 138:12-139:19; Carrasco Dep. 108:1-25. Defendant

8    Carrasco's involvement with what happened next is in dispute. According to Defendant Carrasco,

9    he stopped at the officer station in the dorm and saw Mr. Manzo being escorted into his cell but

10   could not see inside the cell. Carrasco Dep. 112:1-114:17. According to Mr. Manzo, the nonparty

11   officers escorted him into the cell, where the mattress was rolled up, and they let him free fall onto

12   the bunk on his stomach and sat on top of him while removing his restraints. Defs.' Submission of

13   Manzo Dep. 142:23-143:8. According to Mr. Manzo, Defendant Carrasco was watching and

14   smirking as this occurred. *Id.* 143:13-25. Mr. Manzo filed a grievance about the incident and

15   claims the doctor he was seeing while incarcerated, Dr. Alexander Chyorny, examined him after

16   the incident and told him his abdominal hernia had torn. *Id.* 148:9-150:25. Dr. Chyorny, in a

17   sworn declaration submitted by Defendants, reports that the type of abdominal hernia Mr. Manzo

18   had would not lead to the level of pain Mr. Manzo claims from this incident, and Dr. Chyorny

19   further states that Mr. Manzo's hernia was not torn, according to his treatment notes. Chyorny

20   Decl. ¶¶ 5-6.

21            **B.  Alleged Deliberately Indifferent Medical Care**

22        Mr. Manzo's complaint contains extensive allegations of deficient medical care relating to

23   his request for a cane (Compl. ¶¶ 28, 53, 60-61, 71) and specialized footwear (Compl. ¶ 29, 47, 59,

24   62, 68-69, 71, 73), and treatment related to his hernia (Compl. ¶ 30, 45, 52, 65, 71), pain

25   medication (Compl. ¶ 31-32, 34-35, 38-39, 47, 63, 67, 70-75), depression medication (Compl. ¶

26   48-50, 56-57), and toenail fungus (Compl. ¶ 40, 66). Defendants respond with copious medical

27   records from more than 70 encounters with medical professionals during Mr. Manzo's 23 months

28   at Main Jail. Mot. 3; Decl. of Jason M. Bussey ¶¶ 7, 10, ECF 57. Regarding the footwear, Mr.

United States District Court
Northern District of California

1 │ Manzo was approved to wear certain shoes by the medical staff, but he was denied permission to

2 │ wear them by Defendant Dowd. Ex. OO, Medical Authorization Form 114, 116, ECF 62.

3 │ **C. Procedural History**

4 │ Manzo filed this complaint on March 2, 2017. *See* Compl., ECF 1. He asserts the following

5 │ causes of action:

6 │     1.  A violation of 42 U.S.C. § 1983 against Defendants Carrasco, Arturo Romero, Adrian

7 │         Romero, Dowd and Shelton alleging excessive force and Eighth Amendment

8 │         violations;

9 │     2.  A violation of 42 U.S.C. § 1983 against the County (*Monell* Claim);

10 │     3.  Conspiracy to commit intentional infliction of emotional distress against Defendants

11 │         Carrasco, Arturo Romero, and Adrian Romero;

12 │     4.  A violation of the California Bane Civil Rights Act, Cal. Civ. Code § 52.1(b), against

13 │         all Defendants;

14 │     5.  A violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et*

15 │         *seq.*, against the County;

16 │     6.  A violation of Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794.,

17 │         against the County.

18 │ Defendants filed this partial summary judgment motion on May 14, 2020. *See* Mot.

19 │ Defendants do not seek summary judgment on the claim that the County failed to provide Manzo

20 │ with "minimum out of cell time," as alleged in Mr. Manzo's second cause of action. Mot. 2. Mr.

21 │ Manzo filed his brief and evidence in opposition on June 16, 2020. *See* Opp'n. Defendants filed

22 │ their reply brief on June 25, 2020. *See* Reply, ECF 69.

23 │ **II.   LEGAL STANDARD**

24 │     **A.  SUMMARY JUDGMENT**

25 │ "A party is entitled to summary judgment if the 'movant shows that there is no genuine

26 │ dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *City of*

27 │ *Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting Fed. R. Civ. P.

28 │ 56(a)). A fact is "material" if it "might affect the outcome of the suit under the governing law,"

*United States District Court*
*Northern District of California*

6

1  and a dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable trier

2  of fact to decide in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242,

3  248 (1986).

4      The party moving for summary judgment bears the initial burden of informing the Court of

5  the basis for the motion and identifying portions of the pleadings, depositions, answers to

6  interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material

7  fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party

8  must either produce evidence negating an essential element of the nonmoving party's claim or

9  defense or show that the nonmoving party does not have enough evidence of an essential element

10 to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.,*

11 *Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). In judging evidence at the summary judgment stage, the

12 Court "does not assess credibility or weigh the evidence, but simply determines whether there is a

13 genuine factual issue for trial." *House v. Bell,* 547 U.S. 518, 559-60 (2006). Where the moving

14 party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no

15 reasonable trier of fact could find other than for the moving party. *Celotex*, 477 U.S. at 325;

16 *Soremekun v. Thrifty Payless, Inc.,* 509 F.3d 978, 984 (9th Cir. 2007).

17     If the moving party meets its initial burden, the burden shifts to the nonmoving party to

18 produce evidence supporting its claims or defenses. *Nissan Fire*, 210 F.3d at 1103. If the

19 nonmoving party does not produce evidence to show a genuine issue of material fact, the moving

20 party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. "The court must view the

21 evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the

22 nonmovant's favor." *City of Pomona*, 750 F.3d at 1049. "[T]he 'mere existence of a scintilla of

23 evidence in support of the [nonmovant's] position'" is insufficient to defeat a motion for summary

24 judgment. *First Pac. Networks, Inc. v. Atl. Mut. Ins. Co.*, 891 F. Supp. 510, 513–14 (N.D. Cal.

25 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). "'Where the record

26 taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

27 genuine issue for trial.'" *First Pac. Networks*, 891 F. Supp. at 514 (quoting *Matsushita Elec.

28 Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

United States District Court
Northern District of California

7

United States District Court
Northern District of California

**B.  QUALIFIED IMMUNITY**

"The doctrine of qualified immunity protects government officials from liability for civil damages 'unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'" *Wood v. Moss*, 134 S. Ct. 2056, 2066–67 (2014) (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011)). In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court set forth a two-part approach for analyzing qualified immunity. The analysis contains both a constitutional inquiry and an immunity inquiry. *Johnson v. County of Los Angeles*, 340 F.3d 787, 791 (9th Cir. 2003). The constitutional inquiry requires the court to determine this threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier*, 533 U.S. at 201. If the Court determines that a constitutional violation could be made out based on the parties' submissions, the second step is to determine whether the right was clearly established. *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202.

The Supreme Court has clarified that the sequence of analysis set forth in *Saucier* is not mandatory and that a court may exercise its sound discretion in determining which of the two prongs of the qualified immunity analysis to address first. *Pearson v. Callahan*, 555 U.S. 223, 241–02 (2009). Thus, in some cases, it may be unnecessary to reach the ultimate constitutional question when officers would be entitled to qualified immunity in any event, a result consistent with longstanding principles of judicial restraint.

The Supreme Court recently reiterated the longstanding principle that "the clearly established right must be defined with specificity." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019). Defining the right at too high a level of generality "avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (quoting *Plumhoff v. Ricard*, 134 S. Ct. 2012, 2023 (2014)). "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes

1   would have understood that he was violating it." *Plumhoff*, 134 S. Ct. at 2023.

2       Importantly, though, "'it is not necessary that the alleged acts have been previously held

3   unconstitutional' in order to determine that a right was clearly established, 'as long as the

4   unlawfulness [of defendant's actions] was apparent in light of pre-existing law.'" *Bonivert v. City

5   *of Clarkston*, 883 F.3d 865, 872 (9th Cir. 2018) (quoting *San Jose Charter of Hells Angels

6   *Motorcycle Club v. City of San Jose*, 402 F.3d 962, 977 (9th Cir. 2005)) (alterations in original).

7   There can be "the rare 'obvious case,' where the unlawfulness of the officer's conduct is

8   sufficiently clear even though existing precedent does not address similar circumstances." *Vazquez

9   *v. City of Kern*, 949 F.3d 1153, 1164 (9th Cir. 2020) (quoting *Wesby*, 138 S. Ct. at 590). The

10  relevant inquiry is "whether the officer had fair notice that her conduct was unlawful." *Nicholson

11  *v. City of Los Angeles*, 935 F.3d 685, 690 (9th Cir. 2019) (quoting *Kisela v. Hughes*, 138 S. Ct.

12  1148, 1152 (2018) (per curiam)).

13

14  **III.   DISCUSSION**

15       **A.   Request for Judicial Notice**

16       Defendants ask the Court to take judicial notice of the following exhibits, and Mr. Manzo

17  does not oppose: Ex. C: Advisement of Rights, Waiver, and Plea Form Felony from Mr. Manzo's

18  criminal case, *People v. Manzo*, No. C1499129 (Cal. Super. Ct. Nov. 14, 2016), ECF 58; Exhibit

19  D: Felony Abstract of Judgment from Mr. Manzo's criminal case, *People v. Manzo*, No.

20  C1499129 (Cal. Super. Ct. Jan. 5, 2017), ECF 58; Ex. P, Domestic Violence Restraining Order,

21  ECF 60; Ex. Q, Tr. of Domestic Violence Restraining Order Hearing, ECF 61; Ex. II, Docket

22  entries from *Conway v. Dias, et. al*, No. 16-CV-00082 (PR) (N.D. Cal. Jan. 7, 2016), ECF 62; Ex.

23  JJ, Docket entries from *Martinez v. County of Santa Clara, et al.*, No. 16-CV-05626 LHK (N.D.

24  Cal. Oct. 4, 2016), ECF 62; Ex. KK: Docket entries from *Vasquez-Bernabe v. County of Santa

25  *Clara, et al.*, No. 16-CV-03218-EJD (N.D. Cal. June 10. 2016), ECF 62; Ex. LL: Docket entries

26  from *Villanueva v. County of Santa Clara*, No. 15-CV-04828-PSG (N.D. Cal. Sept. 18, 2015) and

27  *Villanueva v. County of Santa Clara*, No. 15-CV-04841-NC (N.D. Cal. Oct. 21, 2015), ECF 62;

28  Ex. MM, Special Verdict Form in *Kidgell v. County of Santa Clara, et al.*, No. 08-CV-03396-EJD

(N.D. Cal. April 25, 2012), ECF 62; Ex. PP., *People v. Manzo*, H044320 (Cal. Ct. App. Aug. 31, 2017), ECF 62; and Ex. QQ, Tr. from Oct. 1, 2015 Preliminary Hearing in Mr. Manzo's criminal matter, ECF 62. Mot. 25. All of these documents are court records and properly subject to judicial notice. *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) ("We may take judicial notice of court filings and other matters of public record.").

### B. Excessive Force Claims against Defendants Carrasco, Arturo Romero, Adrian Romero

Defendants seek summary judgment on four use-of-force incidents: 1) the handcuffing and escort into a holding cell by Defendant Adrian Romero; 2) the push by Defendant Arturo Romero that Mr. Manzo claims resulted in a bruise; 3) the control hold applied by Defendant Carrasco; and 4) the cell insertion by nonparty officers. Reply 7; Mot. 12-17. Defendants argue that the force used by the individual defendants was de minimis, justified, or both. Mot. 12-15. Further, Defendants argue that Defendants Carrasco and Adrian Romero are entitled to qualified immunity. Errata, ECF 66.[2]  Defense counsel confirmed at the September 10, 2020 hearing that Arturo Romero is not asserting qualified immunity. Mr. Manzo argues that 1) the amount of force used far exceeded any need for force, 2) Defendants sought to escalate their use of force instead of trying to limit it; 3) the alleged security problem was minor and did not warrant such a brutal response; 4) his injuries were hardly de minimis; and 5) they knew he was disabled and that Defendant Carrasco held a personal grudge against him. Opp'n 14-16.

To recover damages under 42 U.S.C. § 1983, Mr. Manzo must prove by a preponderance of the evidence that Defendants deprived him of a constitutional right while acting under color of state law. *Tatum v. City & County of San Francisco*, 441 F.3d 1090, 1094 (9th Cir. 2006) (quoting *Gritchen v. Collier*, 254 F.3d 807, 812 (9th Cir. 2001)). To establish excessive force under the Fourteenth Amendment, a pretrial detainee must prove officers: (1) acted intentionally; (2) created a "substantial risk of suffering serious harm;" (3) recklessly disregarded that risk; and (4) injured him as a result. *Castro v. City of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016). "[I]t does not

[2] The parties stipulated that Mr. Manzo would not argue that Defendants failed to raise qualified immunity for Defendants Carrasco and Adrian Romero. Stipulation 2, ECF 65.

matter whether the defendant understood that the force used was excessive, or intended it to be excessive, because the standard is purely objective." *Id.* at 1069 (citing *Kingsley v. Hendrickson*, 576 U.S. 389, 395-398 (2015)). The *Kingsley* court gave a non-exhaustive list of factors to consider when evaluating the reasonableness or unreasonableness of the force used:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Kingsley*, 576 U.S. at 397.

Because an inquiry into excessive force "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom," the Ninth Circuit has held "on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002). The Court will evaluate each alleged use of force separately.

### 1.  March 2015: Handcuff and Escort by Adrian Romero

In March 2015, as Mr. Manzo was heading back to his cell after an unknown female officer told him he would not be going to his court appearance, he passed Defendant Adrian Romero. Defs.' Submission of Manzo Dep. 77:1-11. Mr. Manzo states he was "pretty upset" by the fact that the officers kept cancelling his attendance at his court dates, and he told Defendant Adrian Romero that they (meaning the correctional officers) have "control issues." *Id.* 79:12-17. Mr. Manzo testified that he was told to get on the wall and after that, "they just started restraining me." *Id.* 81:11-13. Defendant Adrian Romero testified that Mr. Manzo was acting aggressive and was "pretty upset" that he would not be going to court. Adrian Romero Dep. 18:9-11; 21:22-23. Defendant Adrian Romero testified that he ordered Mr. Manzo to face the wall in the court tunnel, and he did not comply. *Id.* 22:9-12. Defendant Adrian Romero then used force to lead him by the arm to face the wall, and he placed handcuffs on Mr. Manzo. *Id.* 22:17-19; 23:9-10. Defendant Adrian Romero claims the level of force he used did not lead to any pain. *Id.* 22:17-18. Mr. Manzo claims that he was not resisting Defendant Adrian Romero during this time, and Mr. Manzo claims

his muscles were not tense. Defs.' Submission of Manzo Dep. 83:17-20. Defendant Adrian

Romero agrees that Mr. Manzo was not resisting. Adrian Romero Dep. 23:25-24:4. Mr. Manzo

further claims that he was restrained, pushed, and forced into the holding cell. Defs.' Submission

of Manzo Dep. 83:15-16. In Defendant Adrian Romero's words, he was "placed" in the holding

cell. Adrian Romero Dep. 25:23-25. According to Defendant Adrian Romero, there was a "huge

security risk" at the time he used force on Mr. Manzo in the transportation hub because there were

only three deputies responsible for between 80 and 115 incarcerated persons in the area. *Id.* 60:22-

61:12. Seeing an incarcerated person "acting out" can cause riots, according to Defendant Adrian

Romero 61:13-24. Mr. Manzo argues that there was no security threat from one person mouthing

off, opp'n 15, but he does not cite to any evidence to establish that fact.

The Court finds that the amount of force used in this interaction is factually disputed, and

therefore it is not proper for adjudication at the summary judgment stage. The Court also finds that

it is not appropriate to decide qualified immunity at this stage of the case. *See Glenn v.

Washington County*, 673 F.3d 864, 870 (9th Cir. 2011) ("We express no opinion as to the second

part of the qualified immunity analysis and remand that issue to the district court for resolution

after the material factual disputes have been determined by the jury."); *Espinosa v. City & County

of San Francisco*, 598 F.3d 528, 532 (9th Cir. 2010) (affirming a denial of summary judgment on

qualified immunity grounds because there were genuine issues of fact regarding whether the

officers violated plaintiff's Fourth Amendment rights, which were also material to a proper

determination of the reasonableness of the officers' belief in the legality of their actions); *Santos*,

287 F.3d at 855 n.12 (finding it premature to decide the qualified immunity issue "because

whether the officers may be said to have made a 'reasonable mistake' of fact or law may depend

on the jury's resolution of disputed facts and the inferences it draws therefrom"). Should

Defendants bring a post-trial motion for qualified immunity, Mr. Manzo must understand that it

will be his burden to define the violated right with specificity and identify prior controlling

precedent that demonstrates that the right was clearly established at the time of the challenged

conduct. *Sharp v. County of Orange*, 871 F.3d 901, 911 (9th Cir. 2017) ("Except in the rare case

of an 'obvious' instance of constitutional misconduct (which is not presented here), Plaintiffs must

United States District Court
Northern District of California

12

1   'identify a case where an officer acting under similar circumstances as [defendants] was held to

2   have violated the [relevant constitutional] Amendment.'") (quoting *White v. Pauly*, 137 S. Ct. 548,

3   552 (2017) (per curiam)). Simply stating, "[t]he sheer number of seminal United States Supreme

4   Court cases that control this area of law simply prevents the Defendants from qualified immunity

5   with these facts" and citing cases that were decided *after* the events of this case, opp'n 24-25, will

6   not be sufficient to defeat qualified immunity.

7           The Court finds the cases Defendants cite for the authority that the Court should grant

8   summary judgment as a matter of law distinguishable from this case. In *Tatum*, police used a

9   control hold on a man attempting to resist arrest by trying to spin out of the officer's grasp. 441

10   F.3d at 1096 (9th Cir. 2006). Here, by Defendants' admission, Mr. Manzo was only engaging in

11   verbal exchanges with the officers when Defendant Adrian Romero initiated the encounter with

12   Mr. Manzo. Mot. 15. In *White v. Roper*, the plaintiff refused to follow a directive to enter a cell

13   and backed away from the sergeant, creating a need to use force. 901 F.2d 1501, 1507 (9th Cir.

14   1990). Here, while Defendant Adrian Romero maintains Mr. Manzo was ignoring his directives,

15   Mr. Manzo presents a different interpretation of the facts, and that factual dispute must be left to

16   the jury.

17           Accordingly, Defendants' motion for summary judgment is DENIED on this claim.

18          **2.   March 2015: Push by Arturo Romero**

19           After Mr. Manzo was placed in the holding cell by Defendant Adrian Romero, he was

20   moved into a different cell by Defendant Arturo Romero. Defs.' Submission of Manzo Dep. 89:5-

21   12; 93:14-17; 94:12-16. Mr. Manzo was still handcuffed at this time. *Id.* 97:19-22. Mr. Manzo

22   alleges that, as Defendant Arturo Romero was inserting him into the second cell, he "shoved" him,

23   and Mr. Manzo alleges, "I went flying into a door frame," and "almost fell." *Id.* 89:7-12. Mr.

24   Manzo alleges his shoulder was bruised as a result of the incident. *Id.* 97:13. Defendants dispute

25   that Mr. Manzo was bruised as a result of this incident and offer medical records from

26   appointments on March 5 and March 6 that do not mention a bruise to demonstrate its absence.

27   Medical Records 154-58. However, the parties dispute the date of this event, which may make the

28   lack of notation in the medical records irrelevant if they predate the incident. Mr. Manzo, while

United States District Court
Northern District of California

13

not a doctor, has the ability to self-diagnose a bruise. Defendant Arturo Romero remembers this event quite differently, as he testified that he "didn't put hands" on Mr. Manzo. Ex. U, Dep. of Arturo Romero ("Arturo Romero Dep.") 30:7-10, ECF 61.

As with the previous claim, the Court finds that the amount of force used in this interaction is factually disputed, and therefore it is not proper for adjudication at the summary judgment stage. Defendant Arturo Romero does not seek qualified immunity on this claim.

Taking the facts in the light most favorable to Mr. Manzo, the Court does not find the cases cited by Defendants for awarding judgment as a matter of law persuasive. In *Lyons v. Leonhardt*, 407 F. App'x 162, 165 (9th Cir. 2010), cited by Defendants, there does not appear to be a claim of actual injury, like Mr. Manzo's bruise. *Id.* (holding that officers applying handcuffs tightly, pulling plaintiff quickly from the floor to his feet, moving him to a different room, and seating him roughly in a chair, does not, without more, rise to the level of excessive force). In *DeWalt v. Carter*, a Seventh Circuit case, the plaintiff suffered bruising on his back when he was shoved into a door frame; the prison medical staff, however, did not note any visible injury and did not order X-rays. 224 F.3d 607, 611 (7th Cir. 2000), *abrogated on other grounds by Savory v. Cannon*, 947 F.3d 409 (7th Cir. 2020). Against the higher Eighth Amendment standard for excessive force, the court found that "[t]he shove was a single and isolated act, unaccompanied by further uses of force," and was de minimis force that did not raise to the level of cruel and unusual punishment. *Id.* 620. In the present case, under Ninth Circuit law, the Court does not feel this is the rare case where the factual determination should be taken from the jury. *Santos*, 287 F.3d at 853. The Court is mindful that "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Hudson v. McMillian*, 503 U.S. 1, 9, (1992) (internal citation omitted). However, the court will allow the jury to decide whether this use of force is de minimis and thus below the constitutional threshold. *Id.* 9-10.

Accordingly, Defendants' summary judgment motion on this claim is DENIED.

### 3.  June 15, 2015: Control Hold by Inocente Carrasco

Mr. Manzo was scheduled to appear in Court on June 15, 2015. The parties agree that Defendant Carrasco ordered Mr. Manzo to step out of the holding cell, and they agree that Mr.

14

United States District Court
Northern District of California

1   Manzo did not comply. Defs.' Submission of Manzo Dep. 127:2-8; Carrasco Dep. 100:5-8. The

2   parties do not agree on the events leading up to Defendant Carrasco ordering Mr. Manzo to step

3   out of the holding cell. According to Mr. Manzo, Defendant Carrasco saw him talking to another

4   person in the holding cell, became upset, and ordered him to step out. Defs.' Submission of Manzo

5   Dep. 126:19-127:3. Mr. Manzo testified that he was trying to explain to Defendant Carrasco that

6   his lawyer would be contacting Defendant Carrasco about the restraining order that had been filed

7   by Defendant Carrasco's sister, who was also Mr. Manzo's ex-girlfriend. *Id.* 133:21-134:15.

8   According to Defendant Carrasco, Mr. Manzo "was given two orders to exit the cell and in

9   defiance responded, fuck you, I'm not leaving, I'm not exiting," and then Defendant Carrasco and

10   another deputy "grabbed him and brought him out of the cell." Carrasco Dep. 102:1-17.

11         Mr. Manzo states that Defendant Carrasco and the other deputy were restraining him "had

12   me up against the wall, tried to make me stand up on my toes, which I cannot do due to the fact of

13   my nerve damage, what was going on. I was pleading to Carrasco that I was disabled and he his

14   response was, 'Shut up. You walk fine.'" Defs.' Submission of Manzo Dep. 127:10-15. Defendant

15   Carrasco does not recall what Mr. Manzo said while up against the wall. Carrasco Dep. 107:20-24.

16   Both parties agree that Defendant Carrasco had Mr. Manzo in a control hold with a twist lock and

17   a wrist lock. Carrasco Dep. 103:18-24; Defs.' Submission of Manzo Dep. 136:14-18. As stated

18   previously, Mr. Manzo testified that the position caused him pain due to his disability. *Id.* 127:10-

19   15; 137:10-12.

20         As with the other use of force incidents in this case, the Court finds that the amount of

21   force used in this interaction is factually disputed, and therefore it is not proper for adjudication at

22   the summary judgment stage. And due to the factual dispute, the Court cannot resolve qualified

23   immunity at this time. Although *Tatum* and *Roper* present facts similar to the facts as presented by

24   Defendants, Mr. Manzo's deposition testimony places in dispute the circumstances leading up to

25   the control hold and the degree of force used. For the same reason, *Johnson v. King County*, No.

26   C14-690 MJP-BAT, 2015 WL 3473462, at *5 (W.D. Wash. June 2, 2015), in which the court

27   found that the amount of force used reasonable and granted summary judgment, is inapposite as

28   well. Here, the Court finds disputed facts and therefore cannot make a reasonableness

1    determination.

2        Accordingly, Defendants' motion for summary judgment on this claim is DENIED.

3        **4.  June 15, 2015: Cell Insertion by Nonparty Defendants**

4        Eventually, Defendant Carrasco stopped physically restraining Mr. Manzo and was

5    relieved by other officers who are not parties to this case. Both parties agree that nonparty deputies

6    escorted Mr. Manzo back upstairs to his housing unit with Defendant Carrasco following, but no

7    longer touching, Mr. Manzo. Defs.' Submission of Manzo Dep. 138:12-139:19; Carrasco Dep.

8    108:1-25. According to Defendant Carrasco, he stopped at the officer station in the dorm and saw

9    Mr. Manzo being escorted into his cell but could not see inside the cell. Carrasco Dep. 112:1-

10   114:17. According to Mr. Manzo, the nonparty officers escorted him into the cell, where the

11   mattress was rolled up, and they let him free fall onto the bunk on his stomach and sat on top of

12   him while removing his restraints. Defs.' Submission of Manzo Dep. 142:23-143:8. According to

13   Mr. Manzo, Defendant Carrasco was watching and smirking as this occurred. *Id.* 143:13-25. Mr.

14   Manzo filed a grievance about the incident and claims the doctor he was seeing while incarcerated,

15   Dr. Alexander Chyorny, examined him after the incident and told him his abdominal hernia had

16   torn. *Id.* 148:9-150:25. Mr. Manzo also claims another part of his body near his beltline was torn

17   as well. *Id.* 149:22-25. Dr. Chyorny, in a sworn declaration submitted by Defendants, reports that

18   the type of abdominal hernia Mr. Manzo had would not lead to the level of pain Mr. Manzo

19   claims, and Dr. Chyorny further states that Mr. Manzo's hernia was not torn, according to his

20   treatment notes. Chyorny Decl. ¶¶ 5-6.

21       In an employee's report submitted on June 16, 2015, one day after the incident, Defendant

22   Carrasco wrote that he radioed to request assistance after he had removed Mr. Manzo from the

23   holding cell following their verbal exchange.  Ex. Y, Employee's Report 95, ECF 61. Defendant

24   Carrasco requested a that a sergeant with a video camera respond to his request. *Id.* That request

25   was honored, but Sergeant Bradley Taylor, the responding officer, did not save the footage

26   because nothing that transpired was worth preserving. Ex. Z, Dep. of Bradley Taylor 53:6-12, ECF

27   61. Mr. Manzo recalls that Defendant Carrasco was standing next to Taylor and smirking while

28   Taylor was recording. Defs.' Submission of Manzo Dep. 143:9-25.

United States District Court
Northern District of California

1    Months later, on October 2, 2015, Mr. Manzo complained about improper use of force

2   against him by the transportation deputies, including Defendant Carrasco, and specifically

3   mentioned the June 15, 2015 incident. Ex. AA, Memorandum 123, ECF 61. The investigation

4   resulted in a formal written admonishment for Defendant Carrasco for his role in the verbal

5   altercation with Mr. Manzo on June 15, 2015. Ex BB, Formal Written Counseling, ECF 61. The

6   form notes that Mr. Carrasco has an attitude problem that needs improvement. *Id.* The report states

7   that, "C/Deputy Carrasco has been admonished not to have contact with inmate Manzo at any time

8   for any reason. This admonishment is set for the Transportation Unit, Main Jail, Courts, and

9   Elmwood, whether on overtime or straight time," and this prohibition was to remain in effect as

10   long as Mr. Manzo is in custody. *Id.*

11    In his opposition brief, Mr. Manzo argues broadly that all defendants are liable as integral

12   participants in the unlawful conduct. Opp'n 16-17. He does not specify which conduct he is

13   referring to and cites *Boyd v. Benton County*, 374 F.3d 773 (9th Cir. 2004) for the proposition that

14   "integral participation does not require that each officer's actions themselves rise to the level of a

15   constitutional violation." *Id.* 17. This theory is expressed immediately after the section regarding

16   allegations concerning Defendant Carrasco. In the light most favorable to the nonmoving party,

17   the Court will construe the "integral participation" argument as relating to Defendant Carrasco's

18   involvement with both use-of-force events that occurred on June 15, 2015. In *Boyd*, all officers on

19   the scene when one officer threw an explosive flash-bang device into an apartment were held to be

20   integral participants. *Id.* 780.  The Ninth Circuit found "the use of the flash-bang was part of the

21   search operation in which every officer participated in some meaningful way," and  "every officer

22   was aware of the decision to use the flash-bang, did not object to it, and participated in the search

23   operation knowing the flash-bang was to be deployed." *Id.* 780.

24    Here, in Mr. Manzo's case, the Court finds factual disputes as to Defendant Carrasco's role

25   in the cell insertion. For this reason, summary judgment, and resolution of qualified immunity, are

26   not appropriate at this time. Defendants' motion for summary judgment on this claim is DENIED.

27    **C.  Deliberate Indifference**

28   A pretrial detainee's claim for deliberately indifferent medical care arises under the

United States District Court
Northern District of California

17

1    Fourteenth Amendment. *Gordon v. County of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018).

2    These claims must be evaluated under an objective deliberate indifference standard. *Id.* at 1125

3    (citing *Castro*, 833 F.3d at 1070). The elements of a pretrial detainee's medical care claim under

4    the due process clause are:

6        (i) the defendant made an intentional decision with respect to the conditions under which
         the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of
7        suffering serious harm; (iii) the defendant did not take reasonable available measures to
         abate that risk, even though a reasonable official in the circumstances would have
8        appreciated the high degree of risk involved—making the consequences of the defendant's
         conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's
9        injuries.

10   *Gordon*, 888 F.3d at 1125. For the third element, the defendant's conduct must be objectively

11   unreasonable, *Id.* (quoting *Castro*, 833 F.3d at 1071). "[T]he plaintiff must 'prove more than

12   negligence but less than subjective intent—something akin to reckless disregard.'" *Gordon*, 888

13   F.3d at 1125 (quoting *Castro*, 833 F.3d at 1071). Under this test, there is no separate inquiry into

14   an officer's subjective state of mind. *See Gordon*, 888 F.3d at 1125 n.4.

15           Mr. Manzo brings deliberate indifference claims against Defendants Shelton and Dowd,

16   both of whom are correctional officers and not medical providers. *See* Compl. ¶¶ 11-12, 42, 59.

17   Defendants argue that both Defendants Shelton and Dowd are entitled to qualified immunity. Mot.

18   22. Mr. Manzo does not address Defendants qualified immunity arguments with regard to

19   Defendants Shelton and Dowd. The only two cases Mr. Manzo cites to defeat qualified

20   immunity—*Kingsley* and *Rodriguez v. County of Los Angeles*, 891 F.3d 776 (9th Cir. 2018) —

21   involve excessive force, not deliberate indifference. Opp'n 24-25. And both cases were decided

22   *after* the events of this case, which prevents them from proving what law was clearly established

23   at the time of the officers' conduct. Mr. Manzo does cite other cases in his arguments about the

24   County's deliberate indifference. Opp'n 6-12. This case is not the rare instance involving obvious

25   constitutional misconduct.

26           **1.  Defendant Dowd**

27           Mr. Manzo alleges that Defendant Dowd denied Mr. Manzo's request to recreate in a yard

28   with a bench—a request made as Mr. Manzo was walking with a group headed to recreate in a

different yard. Compl. ¶ 42; Defs' Submission of Manzo Dep. 174:20-175:1; 175:20-21.

Defendant Dowd denied this request. Mr. Manzo testified that he asked Defendant Dowd to switch

to the yard with the bench "because of my disabilities," and Defendant Dowd allegedly replied, "I

don't give a fuck. Sit on the fucking ground." *Id.* 174:24-175:1. Mr. Manzo does not allege that

Defendant Dowd had any other evidence of his medical need to recreate in the yard with a bench.

While not their burden, Defendants cite to *Frost v. Agnos*, 152 F.3d 1124 (9th Cir. 1998) for the

rule that "this one-time, accidental denial of recreation cannot support a constitutional claim." *Id.*

1130. In *Frost*, the plaintiff was denied recreation on only one occasion because a prison official

misunderstood a note in his file to be a security override. *Id.* To evaluate whether Defendant Dowd

is entitled to qualified immunity, the Court considers the following: Was it clearly established that

a correctional officer was required to change the location of a planned recreation period as the men

were on their way to the yard because one man said he needed a bench to accommodate his

medical needs? The Court finds that this right was not clearly established, and Mr. Manzo has

cited no case supporting his claim. Accordingly, Defendant Dowd is entitled to qualified

immunity, and Defendants' motion for Summary Judgment on the claim against Defendant Dowd

is GRANTED.

### 2. Defendant Shelton

Mr. Manzo alleges that Defendant Shelton was deliberately indifferent to his serious

medical need when he denied his medical recommendation for "closed deck shoes." Compl. ¶ 59.

Defendants argue that, according to Defendant Shelton's notes on the July 29, 2016 medical

authorization form, he denied the request because there was "no reason stated." Medical

Authorization Form 114. The form states, "Please allow closed deck shoes x 3 months as per

MD's orders." *Id.* Defendant Shelton denied a second medical authorization form on August 24,

2016, that stated Mr. Manzo "may use own shoes for ankle/foot pain x 3 months." Medical

Authorization Form 116. Defendant Shelton wrote, "Security reasons/shoes not specified/ankle

brace possible?" *Id.* Defendants argue "no case established liability for denying an incomplete or

confusing deck-shoe request." Mot. 22. Mr. Manzo does not respond directly to this argument in

his opposition brief.

United States District Court
Northern District of California

1        To evaluate under the second prong of the qualified immunity analysis whether Defendant

2 Shelton is entitled to qualified immunity, the Court considers the following: Was it clearly

3 established that a correctional officer must approve medically authorized requests when the

4 correctional officer determines that the medical authorization form is incomplete or there are

5 security reasons for denying the request? In his general discussion of his deliberate indifference

6 claim against the County, Mr. Manzo cites *McGuckin v. Smith*, which established that "chronic

7 and substantial pain" can qualify as a serious medical need. 974 F.2d 1050, 1059 (9th Cir. 1992),

8 *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1137 (9th Cir. 1997).

9 And Mr. Manzo cites cases that establish that a delay in treatment that causes pain can amount to

10 deliberate indifference. *See Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (finding triable

11 issues of fact under higher Eighth Amendment standard when fractured thumb took months to

12 receive treatment); *Clement v. Gomez*, 298 F.3d 898, 905 (9th Cir. 2002) (denying qualified

13 immunity when officers delayed showers for four hours after a pepper spray incident). *Clement*

14 found "it was also clearly established that the officers could not intentionally deny or delay access

15 to medical care." *Id.* at 906.

16        However, the cases Mr. Manzo cites are factually distinct from this one and identify the

17 right generally, not with the requisite specificity. "The Supreme Court has repeatedly instructed

18 that we examine 'whether the violative nature of particular conduct is clearly established' by

19 controlling precedent, not whether the conduct violates a general principle of law.'" *Sharp v.*

20 *County of Orange*, 871 F.3d 901, 910 (9th Cir. 2017) (quoting *Mullenix v. Luna*, 136 S.Ct. 305,

21 308 (2015) (per curiam)). "[A] defendant cannot be said to have violated a clearly established right

22 unless the right's contours were sufficiently definite that any reasonable official in the defendant's

23 shoes would have understood that he was violating it." *Plumhoff*, 134 S. Ct. at 2023. Here, Mr.

24 Manzo has made no attempt to define the right specifically. In fact, Mr. Manzo's opposition brief

25 does not mention Defendant Shelton even once. The Court finds that Defendant Shelton is entitled

26 to qualified immunity. Accordingly, Defendants' summary judgment motion on this claim is

27 GRANTED.

28     **D.  Monell Claims**

United States District Court
Northern District of California

1    Mr. Manzo asserts a *Monell* claim against the County for his excessive force claims, and,

2    according to him, for deliberate indifference to his medical needs. The Court will address both

3    claims.

4    "A government entity may not be held liable under 42 U.S.C. § 1983, unless a policy,

5    practice, or custom of the entity can be shown to be a moving force behind a violation of

6    constitutional rights." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citing

7    *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 (1978)). "In order to establish liability

8    for governmental entities under Monell, a plaintiff must prove '(1) that [the plaintiff] possessed a

9    constitutional right of which [s]he was deprived; (2) that the municipality had a policy; (3) that

10   this policy amounts to deliberate indifference to the plaintiff's constitutional right; and, (4) that the

11   policy is the moving force behind the constitutional violation.' " *Dougherty*, 654 F.3d at 900

12   (quoting *Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997))

13   (alterations in original).

14   ### 1.  Deliberate Indifference to Serious Medical Needs[3]

15   As a threshold matter, Defendants argue that Mr. Manzo has not properly pled a claim for

16   deliberate indifference against the County since it does not appear in the "Claims for Relief" or

17   "Monell Liability" section of the complaint. Mot. 18-19; Reply 1. The Defendants do argue in the

18   alternate that such a claim fails regardless. Mot. 19-23. Mr. Manzo points to the "more than 10

19   pages" of factual allegations related to this claim, opp'n 4, and argues he has met his burden for

20   notice pleading. *See Johnson v. City of Shelby*, 574 U.S. 10, 12 ("Having informed the city of the

21   factual basis for their complaint, they were required to do no more to stave off threshold dismissal

22   for want of an adequate statement of their claim."). The Court agrees with Mr. Manzo that this

23   claim is properly pled against the County.

24   Under the Fourteenth Amendment, deliberately indifferent medical care creates public

25   entity liability where there is: 1) a constitutional violation; 2) a "direct causal link" between that

26

27   _____

28   [3] Mr. Manzo also asserts a deliberate indifference claim against the County for unconstitutional conditions of confinement, but Defendants are not seeking summary judgment on this claim. Mot. 2, 19.

United States District Court
Northern District of California

1   violation and a municipal "policy or custom"; 3) facts notifying the entity that its "customs or

2   policies posed a substantial risk of serious harm"; and 4) the entity's deliberately indifferent

3   adherence to the policy. *Castro*, 833 F.3d at 1075-78; *see also Gordon*, 888 F.3d at 1125

4   (extending *Castro* to medical claims).

5          Defendants argue that *Monell* liability cannot be established based on a single plaintiff's

6   experience. Reply 6.  Mr. Manzo argues that a "custom" for purposes of *Monell* liability can be

7   established from the County's pattern of behavior toward a single individual. Opp'n 12*; Oyenik v.*

8   *Corizon Health Inc.*, 696 F. App'x 792, 794 (9th Cir. 2017). In *Oyenik*, an unpublished and

9   nonprecedential opinion, the plaintiff showed "at least a dozen instances of Corizon denying or

10  delaying consultations, biopsies, and radiation treatment for his prostate cancer over the course of

11  almost a year." *Id.* at 794. The court wrote, "There is no case law indicating that a custom cannot

12  be inferred from a pattern of behavior toward a single individual, and a reasonable jury may

13  conclude that such delay tactics amount to a Corizon custom or practice of deliberate indifference

14  to prisoners' serious medical needs." *Id.* at 794-95.

15         Although *Oyenik* is not a precedential opinion, the observation about the state of Ninth

16  Circuit law is unquestionably correct. The cases relied on by Defendants only involve one or two

17  incidents, not dozens like *Oyenik*. *See Picray v. Sealock*, 138 F.3d 767 (9th Cir. 1998) (involving

18  one person twice denied entrance to a polling place on a single day, resulting in one arrest);

19  *Meehan v. County of Los Angeles*, 856 F.2d 102 (9th Cir. 1988) (featuring two raids on the same

20  residence). Other courts in this district have followed *Oyenik* and found *Monell* liability possible

21  based on the experience of one incarcerated person. *See Lozano v. County of Santa Clara*, No. 19-

22  CV-02634-EMC, 2019 WL 6841215, at *18 (N.D. Cal. Dec. 16, 2019) (dismissing claims with

23  leave to amend on the possibility that a *Monell* claim could be made based on dozens of denials

24  and delays of medical treatment for single person).

25         However, as the court noted in *Lozano*, the burden is still on the plaintiff to establish that

26  any denial or delay in care amounts to a constitutional violation. *Id.* Mr. Manzo has not put forth

27  any evidence of unconstitutional conduct by the medical staff, and Defendants have provided

28  evidence of over 70 medical consultations Mr. Manzo had with medical staff, which amounts to

1   over 1,000 pages of medical records. Mot. 3. None of the allegations in the complaint, separately

2   or taken as a whole, amount to a constitutional violation in light of Mr. Manzo's failure to submit

3   medical evidence. Mr. Manzo disagrees with the timing of his medical treatment and the treatment

4   itself, but this does not amount to deliberate indifference. *Hamby v. Hammond*, 821 F.3d 1085,

5   1092 (9th Cir. 2016) ("[a] difference of opinion between a physician and the prisoner—or between

6   medical professionals—concerning what medical care is appropriate does not amount to deliberate

7   indifference.") (internal citation omitted). The Court will review Mr. Manzo's medical claims.

8   ### a.  Request for a Cane

9   Mr. Manzo alleges that he requested a cane the day he was booked in Main Jail, December

10  18, 2014. Compl. ¶ 28. He further alleges that in early April 2016, he fell and hurt his wrist and

11  knee, injuries that would have been avoided with a cane. Compl. ¶ 53. On July 14, 2016, Mr.

12  Manzo alleges he requested a cane again, a request that was approved on July 16, 2016, for use

13  outside of his pod and for walking long distances. Compl. ¶ 60. He alleges that unnamed deputies

14  harassed him and punished him when he asked for his cane, but according to Mr. Manzo's own

15  testimony, he could not recall ever being denied his cane or any punishment that resulted from him

16  asking for his cane. Compl. ¶ 61; Defs.' Submission of Manzo Dep. 229:24-233:18. Mr. Manzo

17  does not present any medical evidence substantiating the medical necessity of the cane.

18  Defendants have submitted evidence that Dr. Chyorny initially did authorize a cane for Mr.

19  Manzo in order to avoid "muscle weakness and deterioration." Chyorny Dep. 58:33-59:12. When

20  Dr. Chyorny solicited a second opinion from Mr. Manzo's rehabilitation specialists, and they

21  deferred to his discretion. *Id.* 60:11-17; Ex. H, Valley Medical Center Records ("VMC Records")

22  62, ECF 59. When Dr. Chyorny authorized the cane for limited purposes, it was for foot pain

23  management reasons as opposed to functional necessity. Chyorny Dep. 59:7-20. Based on

24  Defendants' undisputed evidence, Mr. Manzo cannot establish a claim for deliberate indifference

25  to serious medical needs based on the initial denial of his request for a cane.

26  ### b.  Pain Medication

27  Mr. Manzo alleges he did not receive Neurontin, a pain reliever also known as Gabapentin,

28  during his first month in custody. Compl. ¶¶ 31-32, 34-35; Chyorny Dep. 115:16-18. However,

United States District Court
Northern District of California

1   Defendants have provided medical records that establish both that Gabapentin was prescribed to

2   Mr. Manzo and that he was delivered the drug. Chyorny Dep. 81:25-82:22, 102:9-21, 105:5-9;

3   Medical Records 138; Ex. J, Medical Administration Records 118, 120, ECF 59. Later during his

4   incarceration, Mr. Manzo alleges he was not receiving enough Gabapentin. Compl. ¶¶ 38-39, 47,

5   67, and Defendants submitted evidence supporting Dr. Chyorny's dosing decisions, including the

6   fact that Gabapentin causes weight gain, something Mr. Manzo needed to avoid in order to qualify

7   for the hernia surgery he requested. Chyorny Dep. 41:13-45:9, 49:18-50:3, 50:23-51:15.

8   Regarding Mr. Manzo's complaint that the County gave him Lidocaine cream, which was less

9   effective than a patch (Compl. ¶ 63), the County has presented evidence that the cream was

10  discontinued, and the patch was renewed at his next medical appointment. Medical Records 198.

11  Finally, the County notes that Mr. Manzo alleges isolated incidents where he missed a single dose

12  of medication, Compl. ¶¶ 70, 73, 74-75, but Mr. Manzo has provided no medical evidence

13  establishing that missing a single dose of medicine on four occasions amounts to deliberate

14  indifference. Accordingly, the Court finds that Mr. Manzo cannot establish a claim for deliberate

15  indifference to serious medical needs based on his allegations regarding his pain medication.

16                    **c.   Depression Medication**

17        Mr. Manzo alleges that the County, with "no notice," terminated his depression medication

18  in late October 2015 and in late June 2016. Compl. ¶¶ 48-50, 56-57. The County has provided

19  evidence that Mr. Manzo refused to attend several medical appointments prior to October 2015,

20  and signed forms acknowledging his refusal, and he was warned that his medication would be

21  stopped because it could not be renewed if he continued to miss appointments. Ex. L, Refusal

22  Forms 224 (May 5, 2015), 225 (April 2, 2015), 212 (Oct. 26, 2015), 219 (July 7, 2015), ECF 59.

23  Further, once Mr. Manzo attended the Nov. 5, 2015 appointment he requested because his

24  medicine had stopped, the Zoloft and Melatonin were once again prescribed. Medical Records

25  178-79. As for the termination of his depression medication in late June 2016, the County has

26  provided evidence that Mr. Manzo twice asked to stop his Zoloft since he was "recovered from his

27  depression." Medical Records 186, 193. The Court finds that Mr. Manzo cannot establish a claim

28  for deliberate indifference to serious medical needs based on his allegations regarding his

depression medication.

### d.  Toenail Treatment

Mr. Manzo alleges that he developed a toenail fungal infection from overflowing toilets, and the County refused to treat his condition. Compl. ¶¶ 40, 66. The County has presented evidence that Mr. Manzo was prescribed terbinafine (Medical Records 188), which, according to Mr. Manzo "help[ed], nails have been clearing." Medical Records 190. As for the ingrown toenail Mr. Manzo links to his fungus issues, he refused the County's treatment options. Ex. N, Treatment Record 27, ECF 60; Medical Records 202. The Court finds that Mr. Manzo cannot establish a claim for deliberate indifference to serious medical needs based on his allegations regarding his toenail treatment.

### e.  Hernia Treatment

Mr. Manzo alleges the County did not provide him with "necessary surgery" for his hernia because he gained too much weight while incarcerated. Compl. ¶ 52. Defendants have submitted evidence that Mr. Manzo's weight at the time of booking was already borderline for the elective repair, and that the chances of a successful surgery would have been "very small." Chyorny Dep. 93:4- 94:7; VMC Records 64, 67. Mr. Manzo has submitted no medical evidence of his own. Accordingly, the Court finds that Mr. Manzo cannot establish a claim for deliberate indifference to serious medical needs based on his allegations regarding his hernia treatment.

### f.  Specialized Footwear

Mr. Manzo alleges that the County did not provide him with the footwear he needed. Compl. ¶ 29, 47, 59, 62, 68-69, 71, 73. Defendants have presented evidence that Mr. Manzo did not have specialized footwear at the time he was arrested (he was wearing Nike high-top shoes), and the County offered him multiple types of shoes in response to his complaints of pain. Defs.' Submission of Manzo Dep. 54:7-9; 181:12-19, 184:5-185:20; Chyorny Dep. 60:20-63:2, 70:23- 72:22; Ex. M, Chyorny Emails 2-3, ECF 60. Mr. Manzo has presented no medical evidence that he needed any type of specialized footwear or that the County's treatment meets the standard for deliberate indifference.

Further, as Mr. Manzo acknowledges, he must establish facts notifying the County that its

United States District Court
Northern District of California

"customs or policies posed a substantial risk of serious harm," which is substantially certain to result in the violation of the constitutional rights of their citizens. Opp'n 11 (citing *Mendiola–Martinez v. Arpaio*, 836 F.3d 1239, 1248-49 (9th Cir. 2016)). In *Castro*, a sobering cell at a correctional facility was noncompliant with the Los Angeles County Code and the California Building Code, and these facts put the county on notice of a substantial risk of serious harm. *Castro*, 833 F.3d at 1076-77. Mr. Manzo has not alleged or established any similar facts that would serve the same purpose in this case. The Court finds that Mr. Manzo cannot establish a claim for deliberate indifference to serious medical needs based on his allegations regarding his footwear treatment.

### g.  Other Claims

In his complaint, Mr. Manzo alleges that he was not given an extra mattress or blanket, compl. ¶¶ 28, 30, or an abdominal support belt for his hernia, compl. ¶ 65, and he also alleges a number of individual instances when he was not provided the medication or relief requested. Mr. Manzo has failed to submit any expert evidence supporting the medical necessity of any of these items, and taken separately and together, none of these claims constitute deliberate indifference to serious medical needs.

### h.  Conclusion

Defendants' motion for summary judgment on the *Monell* claim for deliberate indifference to serious medical needs is GRANTED.

### 2.  Excessive Force

Mr. Manzo pleads three separate theories for his *Monell* claim on excessive force: a pattern of excessive force that amounted to a policy theory, Compl. ¶¶ 116, 124, a failure to train theory, Compl. ¶¶ 120, 123-24, and a ratification theory, Compl. ¶ 119.

### a.  Policy or Custom

For the unlawful policy claim, Mr. Manzo must establish a "longstanding practice or custom which constitutes the standard operating procedure of the local government entity." *Trevino*, 99 F.3d at 918 (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992)). "The custom must be so 'persistent and widespread' that it constitutes a 'permanent and well

United States District Court
Northern District of California

1    settled city policy.'" *Trevino*, 99 F.3d at 918 (quoting *Monell*, 436 U.S. at 691). "Liability for

2    improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon

3    practices of sufficient duration, frequency and consistency that the conduct has become a

4    traditional method of carrying out policy." *Trevino*, 99 F.3d at 918 (citing *Meehan v. Los Angeles*

5    *County*, 856 F.2d 102 (9th Cir. 1988) (two incidents not sufficient to establish custom)).

6            Defendants point to a lack of evidence for Mr. Manzo on this point. Mot. 17-18.

7    Defendants reference Mr. Manzo's initial disclosures, which list individuals who may be used to

8    support his claims or defenses regarding excessive force. Ex. HH, Pl.'s First Supplemental

9    Disclosures, ECF 62. Defendants argue that most of the incidents referenced on the list occurred

10   after the March and June 2015 events in this case. Mot. 18; *See Trevino*, 99 F.3d at 918

11   (emphasizing that no relevant conduct occurred prior to the February 12, 1990 robbery that was

12   the subject of the case). Additionally, Defendants argue that none of the incidents Mr. Manzo

13   disclosed resulted in a finding or admission of fault: of the incidents that resulted in litigation,

14   three settled, *see Conway v. Dias, et. al*, No. 16-CV-00082 (PR) (N.D. Cal. Jan. 7, 2016);

15   *Martinez v. County of Santa Clara, et al.*, No. 16-CV-05626 LHK (N.D. Cal. Oct. 4, 2016);

16   *Vasquez-Bernabe v. County of Santa Clara, et al.*, No. 16-CV-03218-EJD (N.D. Cal. June 10.

17   2016), one was dismissed for failure to prosecute, *see Villanueva v. County of Santa Clara*, No.

18   15-CV-04828-PSG (N.D. Cal. May 26, 2016) and *Villanueva v. County of Santa Clara*, No. 15-

19   CV-04841-NC (N.D. Cal. July 6, 2016), and one resulted in a jury verdict for the County, *see*

20   *Kidgell v. County of Santa Clara, et al.*, No. 08-CV-03396-EJD (N.D. Cal. April 25, 2012).

21           Finally, Defendants argue that if mere allegations of wrongdoing were sufficient, every

22   municipality would be liable for its employees' acts, and *Monell's* rejection of *respondeat*

23   *superior* liability would be meaningless. Mot. 18; *see Alegrett v. City & County of San Francisco*,

24   No. 12-CV-05538-MEJ, 2014 WL 1911405 (N.D. Cal. May 13, 2014) and *Parkison v. Butte*

25   *County Sheriff's Dep't*, No. 2:09-CV-2257 MCE DAD, 2013 WL 1007042 (E.D. Cal. Mar. 13,

26   2013), *report and recommendation adopted*, No. 2:09-CV-02257 MCE, 2013 WL 1345080 (E.D.

27   Cal. Mar. 28, 2013).

28           The Court finds *Alegrett* and *Parkison* persuasive. In *Alegrett*, the court found that

referencing four factually dissimilar civil rights actions filed against the city over a three-year period "do not demonstrate that the City has a policy of condoning excessive force, or establish that Chief Suhr had notice that there was a problem with officers using excessive force." 2014 WL 1911405, at *6 n.5. In *Parkison*, the court cited *Board of County Commissioners of Bryan County v. Brown*, 520 U.S. 397 (1997), which stated, "Congress did not intend municipalities to be held liable unless *deliberate* action attributable to the municipality directly caused a deprivation of federal rights." *Parkison*, 2013 WL 1007042, at *13 (citing *Brown*, 520 U.S. at 400). *Brown* requires that "[w]here a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employees." *Brown*, 520 U.S. at 405. In *Parkison*, evidence of two prior cases against county law enforcement personnel without any evidence to show that any such "policy or custom" was the moving force or cause in fact and proximate cause of plaintiff's alleged deprivation of rights could not establish *Monell* liability. *Parkison*, 2013 WL 1007042, at *13. The Court finds a similar lack of evidence here.

    The Court does not find Mr. Manzo's arguments to the contrary persuasive. Mr. Manzo argues that the County has not affirmatively shown an absence of evidence in the record. Opp'n 19. The Court disagrees and finds the County's argument, as detailed above, affirmatively points to a lack of evidence in the record. To meet its burden, the County, as the moving party, "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire*, 210 F.3d at 1102. The County argues that Mr. Manzo has not established incidents prior to the ones at issue of "sufficient duration, frequency and consistency" that show excessive force is the "traditional method of carrying out policy." *Trevino*, 99 F.3d at 918. Mr. Manzo does not offer any evidence of his own to support his assertion that the County was on notice of "repeated instances of defendants inflicting excessive force on other detainees and engaging in practices that result in cruel and unusual punishment." Opp'n 17. Mr. Manzo references "Plaintiff's proof of multiple similar instances of excessive

United States District Court
Northern District of California

1  force" as "evidence supporting a policy of custom of condoning unconstitutional force by the

2  County," opp'n 18, but he does not cite to any evidence. Viewing the evidence in the light most

3  favorable to the Mr. Manzo and drawing all reasonable inferences in his favor, the Court finds that

4  summary judgment for the County is appropriate here because the County has shown that Mr.

5  Manzo, the nonmoving party, does not have enough evidence of an essential element to carry his

6  ultimate burden of persuasion at trial. Accordingly, Defendants' motion is GRANTED as to this

7  claim.

### b.  Failure to Train

9  A deficient training program "intended to apply over time to multiple employees" can form

10  the basis for municipal liability. *Long v. City of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006)

11  (quoting *Board of County Commissioners v. Brown*, 520 U.S. 397, 407 (1997)). Demonstrating a

12  pattern of constitutional violations is not necessary where "a violation of federal rights may be a

13  highly predictable consequence of a failure to equip law enforcement officers with specific tools to

14  handle recurring situations." *Long*, 442 F.3d at 1186 (quoting *Brown*, 520 U.S. at 409).

15  Here, Defendants submit the training records for Defendants Carrasco, Dowd, Adrian

16  Romero, Arturo Romero, and Shelton. Ex. NN, Training Courses, ECF 62. The records span years

17  and, in some cases, decades. *See Id.* In opposition, Mr. Manzo simply states "the lack of any

18  training, punishment, or discipline for these kinds of acts, is a moving force behind these kinds of

19  brutal beatings occurring over and over again." Opp'n 18-19. Again, though, Mr. Manzo cites no

20  evidence, and the Court cannot identify any evidence presented by Mr. Manzo that indicates he

21  was "brutally beaten" on any occasion. Accordingly, there is no genuine factual issue for trial, and

22  the Court GRANTS Defendants' motion for summary judgment on this claim.

### c.  Ratification

24  Mr. Manzo argues that the County failed to reprimand or discharge the deputies involved

25  in the excessive force incidents. Compl. ¶ 119; Opp'n 18-19.

26  Regarding ratification, or failure to discipline, "Finding that an officer acted within policy

27  does not alone amount to *Monell* ratification." *Sheehan v. Bay Area Rapid Transit*, No. 14-CV-

28  03156-LB, 2016 WL 777784, at *13 (N.D. Cal. Feb. 29, 2016) (internal citations omitted). "In

1    other words, in order for there to be [Monell] ratification, there must be 'something more' than a

2    single failure to discipline *or the fact that the policymaker concluded that the defendant officer's*

3    *actions were in keeping with the applicable policies and procedures.*" *Sheehan*, 2016 WL 777784,

4    at *13 (quoting *Garcia v. City of Imperial*, No. 08-cv-2357 BTM (PCL), 2010 WL 3911457, *2,

5    (S.D. Cal. Oct. 4, 2010)) (emphasis in original).

6

7       This "something more" may be an "obviously flawed investigation" into an excessive-
        force complaint. *See Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir. 1991). It may
8       exist where the final decision-maker "actively participated" in the challenged conduct. *See
        Lytle v. Carl*, 382 F.3d 978, 986-88 (9th Cir. 2004). "Extreme factual situations" can also
9       support ratification liability, as in the Fifth Circuit case in which the departmentally
        unpunished police officers had "poured their gunfire" at the perpetrator's vehicle and "into
10      the person of an innocent bystander." See Garcia, 2010 WL 3911457 at *2 (discussing
        *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985)).

11

12   *Sheehan*, 2016 WL 777784.

13       Here, Mr. Manzo has presented no facts or evidence of "something more" than a single

14   failure to discipline. In fact, Defendants have produced a detailed investigative report that

15   examines all of Mr. Manzo's excessive force claims against several transportation unit deputies,

16   including Defendants Adrian Romero and Carrasco. *See* Memorandum. The County did *not* ratify

17   Defendant Carrasco's conduct on June 15, 2015, and instead admonished him not to have contact

18   with Mr. Manzo for the rest of the time he was in custody. *See* Formal Written Counseling.

19   Accordingly, the Court finds Summary Judgment appropriate on this claim and will GRANT

20   Defendants' motion as to this claim.

21            **3.   Conclusion**

22       The Court GRANTS Defendants' motion for summary judgment regarding the *Monell*

23   claims.

24        **E.  Intentional Infliction of Emotional Distress**

25       Mr. Manzo alleges a claim for intentional infliction of emotional distress under California

26   state law against Defendants Carrasco, Arturo Romero, and Adrian Romero, and Mr. Manzo also

27   alleges this claim against the County pursuant to a *respondeat superior* theory. Compl. ¶¶ 126-

28   130. Defendants argue this claim is time-barred by California's Government Claims Act. The

1     Court agrees. Mr. Manzo asks the Court for relief it cannot provide. Accordingly, this claim must

2     be dismissed.

3          Under the Government Claims Act, any claim against a public entity or its employees "for

4     injury to person" must be presented to the public entity within six months of the injury. Cal. Gov't

5     Code § 911.2(a). "California statutes or ordinances which condition the right to sue the sovereign

6     upon timely filing of claims and actions are ... *elements of the plaintiff's cause of action* and

7     conditions precedent to the maintenance of the action." *State of California v. Superior Court*, 32

8     Cal. 4th 1234, 1240 (2004) (internal citation omitted) (emphasis in original).

9          Here, the latest relevant act involving these Defendants occurred on June 15, 2015, the day

10    Defendant Carrasco exchanged words with Mr. Manzo, held him in a control hold, and watched

11    other officers insert Mr. Manzo into his cell. Mr. Manzo did not submit his claim until April 25,

12    2016—well past the six-month deadline required by the Government Claims Act. *See* Ex. DD,

13    Claim Against the County of Santa Clara, ECF 61, Ex. EE, Letter of Return Without Action, ECF

14    62 (establishing the date of submission as April 25, 2016, not May 2, 2016, as stamped on the

15    claim form).

16         Section 911.4 details the method for processing a late claim. Cal. Gov't Code § 911.4. If a

17    claim is not presented within the required six-month time period, a written application may be

18    made to the public entity for leave to present that claim within one year of the accrual of the cause

19    of action. *Id.* Mr. Manzo filed a request for leave to present a late claim in November 10, 2016,

20    and that was denied by the County on December 23, 2016. *See* Ex. FF, Request for Leave, ECF

21    62, Ex. GG, Notice of Denial, ECF 62. The notice of denial informed Mr. Manzo that he could

22    petition the appropriate court for an order reliving him from the provisions of Cal. Gov't Code §

23    945.4 and directed him to Cal. Gov't Code § 946.6. Notice of Denial. Section 946.6 states, "a

24    petition may be made to the court for an order relieving the petitioner from Section 945.4. The

25    proper court for filing the petition is a *superior court* that would be a proper court for the trial of

26    an action on the cause of action to which the claim relates." Cal. Gov't Code § 946.6 (emphasis

27    added). Instead of filing in Santa Clara County Superior Court, Mr. Manzo filed this action in

28    federal court on March 2, 2017. This was improper, and courts in this district have found the same.

United States District Court
Northern District of California

1    *See, e.g.*, *Moore v. Thomas*, 653 F. Supp. 2d 984, 1007-08 (N.D. Cal 2009) (dismissing Plaintiff's

2    tort claims with prejudice for failure to timely exhaust his state claims as required by the

3    California Torts Claims Act and § 945.4). Mr. Manzo acknowledges that the County denied his

4    application to present a late claim. Opp'n 22. He then attempts to "elect his remedy and requests

5    that this court consider his late claim." *Id.* Section 945.4 is clear, though, that Mr. Manzo's

6    remedy is in state superior court. Accordingly, the Court finds Mr. Manzo's claim for intentional

7    infliction of emotion distress is time-barred and GRANTS summary judgment as to all Defendants

8    for this claim.

9        **F.  Bane Act Claim**

10       Mr. Manzo brings his Bane Act claim against all Defendants. Compl. ¶¶ 131-134. The

11   Bane Act claim is subject to the Government Claims Act and its timing requirements, just like the

12   claim for intentional infliction of emotional distress. *See Miller v. Adonis*, No. 12-cv-353, 2019

13   WL 4076441, at *18 (E.D. Cal Aug. 29, 2019) (finding dismissal of Bane Act claim for failure to

14   comply with the Government Claims Act proper). As established above, Mr. Manzo filed his

15   claim with the County on April 25, 2016, so the earliest date he can establish a valid claim is

16   October 25, 2015. *See* Letter of Return Without Action. All claims against Defendants Carrasco,

17   Adrian Romero, Arturo Romero, and Dowd occurred before this date and are therefore time-

18   barred. Mr. Manzo alleges that Defendant Shelton denied him closed deck shoes as ordered by a

19   doctor in July and August 2016. Compl. ¶ 59. However, this conduct occurred *after* Mr. Manzo

20   filed his claim on April 25, 2016. *See Miller*, 2019 WL 4076441, at *18 (rejecting Bane Act claim

21   against defendant whose actions had not occurred at the time the claim was submitted); *see also*

22   *Stockett v. Ass'n of Cal. Water Agencies Joint Powers Ins. Auth.*, 34 Cal. 4th 441, 447 (2004)

23   ("[E]ven if the claim were timely, the complaint is vulnerable to a demurrer if it alleges a factual

24   basis for recovery which is not fairly reflected in the written claim.") (internal citation omitted).

25       The only claim that remains is against the County for events that occurred between

26   October 25, 2015, and April 25, 2016. The Bane Act civilly protects individuals from conduct

27   aimed at interfering with rights that are secured by federal or state law, where the interference is

28   carried out "by threats, intimidation or coercion." *Reese v. County of Sacramento*, 888 F.3d 1030,

United States District Court
Northern District of California

32

1    1040 (9th Cir. 2018). For a Bane Act claim, the plaintiff must allege: "(1) defendants interfered

2    with plaintiff's constitutional rights by threatening or committing violent acts; (2) that plaintiff

3    reasonably believed that if she exercised her constitutional rights, defendants would commit

4    violence against her; (3) plaintiff was harmed; and (4) defendants' conduct was a substantial factor

5    in causing plaintiff's harm." *Tolosko-Parker v. County of Sonoma*, Nos. C 06–06841 CRB, C 06–

6    06907 CRB, 2009 WL 498099, at *5 (N.D. Cal. Feb. 26, 2009).

7         The only claims Mr. Manzo brings during the October 25, 2015 – April 25, 2016 time

8    period is the denial of Zoloft and Melatonin at the end of October 2015 and the denial of use of a

9    cane in April 2016. Compl. ¶¶ 48, 53. Neither the denial of the cane or the alleged denial of the

10   medication can support a Bane Act claim since Defendants did not interfere with Mr. Manzo's

11   constitutional rights by threatening or committing violent acts. Denial of the cane is not a

12   constitutional violation because Dr. Chyorny, and Mr. Manzo's rehabilitation specialists, did not

13   find it medically necessary. Chyorny Emails 3. Mr. Manzo has not presented any medical

14   evidence that disputes Dr. Chyorny's opinion, and his own lay opinion is insufficient to call Dr.

15   Chyorny's opinion into dispute. As for the denial of Zoloft and Melatonin at the end of October

16   2015, the medical records contradict Mr. Manzo's allegation that the medicines were denied with

17   "no notice." Mr. Manzo refused to attend several medical appointments prior to October 2015, and

18   signed forms acknowledging his refusal, and he was warned that his medication would be stopped

19   because it could not be renewed if he continued to miss appointments. Refusal Forms 224 (May 5,

20   2015), 225 (April 2, 2015), 212 (Oct. 26, 2015), 219 (July 7, 2015). Further, once Mr. Manzo

21   attended the Nov. 5, 2015 appointment he requested because his medicine had stopped, the Zoloft

22   and Melatonin were once again prescribed. Medical Records 178-79. The Court finds no

23   reasonable jury could find any Defendant interfered with Mr. Manzo's constitutional rights on the

24   basis of these facts.

25        The Court GRANTS Defendants' motion for summary judgment on this claim.

26   **G.  ADA and Section 504**

27        Mr. Manzo brings a claim against the County for violations of the ADA and Section 504 of

28   the Rehabilitation Act. "Title II of the ADA was modeled after Section 504." *McIntyre v. Eugene*

United States District Court
Northern District of California

*Sch. Dist. 4J*, 976 F.3d 902, 912 (9th Cir. 2020) (citing *Duvall v. County of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001)); *see also Castle v. Eurofresh, Inc.*, 731 F.3d 901, 908 (9th Cir. 2013) ("The Rehabilitation Act is materially identical to and the model for the ADA, except that it is limited to programs that receive federal financial assistance.")

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *Simmons v. Navajo County*, 609 F.3d 1011, 1021 (9th Cir. 2010), *overruled on other grounds by Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (en banc).

Similarly, Section 504 provides "No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." *McIntyre*, 976 F.3d at 911 (quoting 29 U.S.C. § 794(a)).

Bringing a suit under the ADA and Section 504 requires the same elements: (1) the plaintiff is a qualified individual with a disability; (2) he was denied a reasonable accommodation that he needs to enjoy meaningful access to the benefits of public services; and (3) the program providing the benefit receives federal financial assistance. *McIntyre*, 976 F.3d at 912 (*citing A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195, 1204 (9th Cir. 2016) and *Mark H. v. Hamamoto*, 620 F.3d 1090, 1097 (9th Cir. 2010)). The County does not dispute that Mr. Manzo is disabled under the ADA and Section 504 or that Main Jail receives federal financial assistance.

Regarding damages, a public entity can be liable "if it intentionally or with deliberate indifference fails to provide meaningful access or reasonable accommodation to disabled persons." *A.G.*, 815 F.3d at 1204 (citing *Mark H. v. Lemahieu*, 513 F.3d 922, 938 (9th Cir. 2008)). Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood. *Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001)

"The ADA prohibits discrimination because of disability, not inadequate treatment for disability." *Simmons*, 609 F.3d at 1022 (citing *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir.

1    1996) ("[T]he Act would not be violated by a prison's simply failing to attend to the medical

2    needs of its disabled prisoners .... The ADA does not create a remedy for medical malpractice."));

3    *see also Gosney v. Gower*, 816 F. App'x 120, 121 (9th Cir. 2020) (citing *Simmons* for the

4    proposition that the ADA prohibits discrimination because of disability, not inadequate treatment

5    for disability). Section 504 has been interpreted similarly. *See, e.g*, *Galvin v. Cook*, No. CV 00-29-

6    ST, 2000 WL 1520231, at *6 (D. Or. Oct. 3, 2000) ("The ADA and Rehabilitation Act afford

7    disabled persons legal rights regarding access to programs and activities enjoyed by all, but do not

8    provide them with a general federal cause of action for challenging the medical treatment of their

9    underlying disabilities.").

10       Mr. Manzo claims that the County failed to accommodate his disability by 1) not

11   approving his requests for supportive shoes for his injured foot; 2) denying him the use of a cane,

12   and 3) denying him the opportunity to recreate in a yard with a bench. Compl. ¶¶ 135-142; Opp'n

13   22-24. Drawing all inferences in Mr. Manzo's favor, he argues that these denials deprived him of a

14   true opportunity to exercise. Opp'n 22.

15       Defendants seek summary judgment for several reasons. Regarding the cane and shoes,

16   Defendants argue that by not receiving these items, Mr. Manzo was treated the same as able-

17   bodied inmates despite his disabilities, which is different than receiving fewer benefits because of

18   those disabilities. Mot. 24, Reply 11-12. Regarding the opportunity for exercise, Defendants argue

19   that Mr. Manzo was able to recreate without the bench, and did so, and that his last-minute request

20   while he was walking to the yard was not a reasonable request for an accommodation as required

21   by the ADA. Mot. 24-25.

22              **1. The Cane**

23       When Mr. Manzo was denied his cane during his first year of incarceration, it was because

24   Dr. Chyorny did not find it medically necessary. Chyorny Decl. 48:23-59:23. Mr. Manzo has

25   presented no evidence to dispute this fact. As such, the County's denial of his request for a cane

26   does not amount to an ADA violation. *See Gosney*, 816 F. App'x at 121 ("As Appellees found the

27   requested assistive devices not medically necessary to Gosney's treatment, their denial of his

28   request does not amount to an ADA violation."). The Court GRANTS summary judgment as to

United States District Court
Northern District of California

35

1    this claim.

2              **2.   The Shoes**

3              The County has presented evidence that Dr. Chyorny and the medical staff engaged with

4    Mr. Manzo in an iterative process regarding progressive footwear solutions. Chyorny Decl. 60:20-

5    63:2; Chyorny Emails 2-3. Mr. Manzo did not have orthopedic footwear before he was

6    incarcerated, so Dr. Chyorny could not authorize bringing in his personal shoes. Chyorny Decl.

7    60:23-61:5. Mr. Manzo was issued several different types of shoes throughout his tenure at Main

8    Jail, and he does not dispute this. Defs.' Submission of Manzo Dep. 184:5-185:20. Mr. Manzo's

9    opposition brief states that the County failed to "reasonably accommodate his requests for

10   supportive shoes for his injured foot," but it does not provide any evidence to sustain this claim.

11   Opp'n 22-23. Defendants evidence establishes that Defendant Shelton twice denied Mr. Manzo's

12   medical authorization forms for deck shoes on forms dated July 29, 2016, and August 24, 2016.

13   Medical Authorization Forms 114, 116. Further, the email thread cited by Defendants includes a

14   July 6, 2016 email from a patients' rights advocate stating that Mr. Manzo has been "approved and

15   waiting on ADA accommodations for some time." Chyorny Emails 3-4. "Orthopedic shoes" are

16   listed among the accommodations. *Id.* 4.

17             However, the County continued to work with Mr. Manzo on a reasonable footwear

18   solution after Defendant Shelton's denials. In a medical consultation with Dr. Chyorny on July 13,

19   2016, Mr. Manzo complained about his heel pain. Medical Records 190. The notes state, "Asking

20   for own shoes, or at least an extra pair of socks. Has commissary shoes, but states that shoe inserts

21   don't fit well into them. Also has an ankle brace, but doesn't wear it, since he doesn't think it's

22   helping. Insists on his own high-top sneakers." *Id.* The notes from another medical consultation

23   with Dr. Chyorny on October 5, 2016, reflect that Mr. Manzo was seen in a podiatry clinic for his

24   foot problems. Medical Records 195. Podiatry recommended a large shoe with more space for

25   inserts. *Id.* Dr. Chyorny testified that he authorized transportation for Mr. Manzo to the Hanger

26   Clinic, where orthopedic footwear is made, but he was released before his appointment. Chyorny

27   Dep. 61:3-62:9.

28             In his opposition brief, Mr. Manzo simply states that the County failed to "reasonably

1    accommodate his requests for supportive shoes for his injured foot," opp'n 22, but he presents no

2    evidence of his own that he proposed a reasonable accommodation that was denied, not just

3    delayed due to security concerns. The evidence submitted by the County leads to the opposite

4    conclusion: there was an ongoing, iterative process in which medical professionals continued to

5    offer and approve reasonable accommodations for footwear. This process lasted throughout Mr.

6    Manzo's incarceration. When Defendant Shelton denied the requests based on security concerns,

7    the medical staff continued to work with Mr. Manzo. Based on the evidence, the Court finds that

8    no reasonable jury could find that the County failed to provide meaningful access or reasonable

9    accommodation to Mr. Manzo with regard to his request for shoes. Summary judgment is

10   GRANTED as to this claim.

11                    **3.  The Bench**

12        Finally, Mr. Manzo alleges that he was denied the opportunity to recreate in a yard with a

13   bench. Compl. ¶ 42. Mr. Manzo "bears the burden of demonstrating 'the existence of a reasonable

14   accommodation' that would enable him to participate in the program, service, or activity at

15   issue.'" *Francis v. Hammond*, 673 F. App'x 661, 664 (9th Cir. 2016) (quoting *Pierce v. County of

16   Orange*, 526 F.3d 1190, 1217 (9th Cir. 2008)). The Court "must also consider whether the

17   challenged policy is 'reasonably related' to the prison's legitimate penological interests." *Francis*,

18   673 F. App'x at 664 (citing *Pierce*, 526 F.3d at 1217).

19        Here, Mr. Manzo made the request to recreate in the yard with a bench once, when he was

20   literally on the way to the yard with a group of people. Defs' Submission of Manzo Dep. 174:20-

21   175:1; 175:20-21. Mr. Manzo notes one other time when an officer asked him if he wanted to go

22   to the yard, and he responded that he wouldn't be accommodated in the bench area, but he did go

23   outside to the yard without a bench to recreate. *Id.* 175:4-9. The Court does not interpret this

24   instance as a request for an accommodation.

25        Under *Francis*, it is Mr. Manzo's burden to establish that his request for a different yard

26   assignment as he and others were on the way outside was reasonable. By his own admission, Mr.

27   Manzo was not prevented from recreating entirely that day. Defs.' Submission of Manzo Dep.

28   176:18-177:2. Mr. Manzo has presented no evidence suggesting that his last-second request

United States District Court
Northern District of California

37

required an immediate "reasonable accommodation." *See Spurlock v. Simmons*, 88 F. Supp. 2d 1189, 1196 (D. Kan. 2000) (granting summary judgment for prison on the basis that a deaf and mute incarcerated person's request for staff to be available and able to immediately assist him whenever he finds it convenient to use the telephone, regardless of other job requirements was not reasonable). Similarly, the Court finds that no reasonable jury could find Mr. Manzo's request reasonable. Defendant Dowd, while supervising a group of incarcerated persons and not just Mr. Manzo, could not reasonably have been expected to change the planned yard assignment and allow Mr. Manzo to go to an empty yard that may or may not have been prepared for use.

Mr. Manzo argues in his opposition brief that a report from a consulting agency detailing alleged ADA violations at Main Jail, *see* Ex. G, Report, ECF 67-8, "establishes a policy, practice or custom for Monell purposes." Opp'n 23-24. There is no *Monell* liability attached to a violation of the ADA.

The Court finds no genuine issue of material fact on Mr. Manzo's ADA and Section 504 claims regarding the bench and will GRANT Defendants' motion for summary judgment on this issue.

## IV. ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that Defendants' motion for summary judgment is:

1. DENIED as to the excessive force claims against Defendants Carrasco, Arturo Romero, and Adrian Romero;

2. GRANTED as to the deliberate indifference claim against Defendant Dowd;

3. GRANTED as to the deliberate indifference claim against Defendant Shelton;

4. GRANTED as to the *Monell* claims for deliberate indifference and excessive force; the *Monell* claim regarding minimum out of cell time was not considered in this motion and remains for trial;

5. GRANTED as to the claims for intentional infliction of emotional distress;

6. GRANTED as to the Bane Act claim;

7. GRANTED as to the ADA and Section 504 claims;

8.  Defendant Dowd is DISMISSED from the action.

9.  Defendant Shelton is DISMISSED from the action.


Dated: November 25, 2020

_____

BETH LABSON FREEMAN
United States District Judge